1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMAR ANTOINE FOSTER,

11              Petitioner,              No. 2:09-cv-3238 KJN P

12         vs.

13   DOMINGO URIBE, JR.,

14              Respondent.              ORDER

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner, proceeding without counsel, with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Both parties have consented to proceed

19   before the undersigned for all purposes.  See 28 U.S.C. § 636(c).  Petitioner challenges his 2006

20   conviction on charges of robbery, assault likely to cause great bodily injury, assault with a

21   firearm, making criminal threats, burglary, grand theft, grand theft of a vehicle, and false

22   imprisonment.  (Resp't's Lodged Document ("LD") 3 at 1.)  On December 18, 2006, petitioner

23   was sentenced to 20 years, 8 months, in state prison.  Two claims are now submitted for

24   ////

25   ////

26   ////

decision:[1]  petitioner claims that the trial court (1) erred in admitting petitioner's confession because it was allegedly coerced; and (2) petitioner's upper-term sentences allegedly violate the Sixth Amendment, citing Cunningham v. California, 549 U.S. 270 (2007).[2]  After careful review of the record, this court concludes that the petition should be denied.

II.  Procedural History

After jury trial, petitioner was convicted on November 16, 2006.  Petitioner was sentenced on December 18, 2006.  (LD 1 at 3.)

Petitioner appealed to the California Court of Appeal, Third Appellate District, and on August 6, 2008, the judgment was affirmed.  (LD 1, 3.)  Petitioner filed a petition for review in the California Supreme Court, which was denied without comment on October 22, 2008.  (LD 4, 5.)

No collateral petitions were filed in state court.

Under the mailbox rule, petitioner filed the instant petition on August 30, 2009. See Houston v. Lack, 487 U.S. 266, 275-76 (1988) (pro se prisoner filing is dated from the date prisoner delivers it to prison authorities).

III.  Factual and Procedural Background[3]

The opinion of the California Court of Appeal contains a factual and procedural background concerning petitioner's offenses and the offenses of his co-defendant, Johnny Lavender.  After independently reviewing the record, the undersigned finds this summary to be

---

[1]  On January 14, 2010, petitioner's ineffective assistance of trial and appellate counsel claims were dismissed as unexhausted, and petitioner was allowed to pursue his second claim that petitioner's sentence allegedly violates the Sixth Amendment, because the court could not "say for sure" that this claim was unexhausted.  (Dkt. No. 9 at 3.)

[2]  In Cunningham, the Supreme Court held that the presumptive middle term, not the upper term, was the "relevant statutory maximum.  Id., 549 U.S. at 288.

[3]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Lavender, et al., No. C054478 (August 6, 2008), a copy of which was lodged by Respondent as LD 3 on March 24, 2010.

accurate and adopts it herein:

> Following the robbery and beating of Tracy Norton, an amended consolidated information charged [Lavender and Foster] with attempted murder (count I), robbery (count II), assault likely to cause great bodily injury (count III), assault with a firearm (count IV), making criminal threats (count V), burglary (count VI), grand theft (count VII), grand theft of a vehicle (count VIII), and false imprisonment (count IX). The information also alleged as to counts I, II, and VI that [Lavender and Foster] personally used a firearm within the meaning of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b). In addition, as to counts V, VII, VIII, and IX, it was alleged [Lavender and Foster] personally used a firearm in the commission of the offenses pursuant to sections 1203.06, subdivision (a)(1) and 12022.5, subdivision (a)(1), causing them to be serious and violent felonies (§§ 1192.7, subd. (c)(8) and 667.5, subd. (c)(8)).

> A jury trial followed. The following evidence was introduced at trial.

**Prelude to the Crimes**

> Around midnight one spring evening in 2007, Lavender and Foster arrived at the apartment of Caitlin Churchill and Chris Scarabello to finalize preparations to rob Tracy Norton. Scarabello found Norton's address and downloaded aerial photos of his property from the Internet. Scarabello also gathered together a silver handgun, a black handgun, a Taser, a bulletproof vest, and duct tape. Churchill drove the men to Norton's residence and waited while the men entered the house.

**The Crimes**

> Early that morning, Norton woke up to find three men standing nearby, pointing guns at his face. Two of the men were black; one was white. The white man, dressed in full camouflage, wore a mask and held a pistol and knife. The two black men wore dark clothes and masks tied around their faces, obscuring them. One of the black men was about six feet tall and slender, and carried a pistol. The other was about five feet eight inches tall, stocky, and carried a revolver.

> The men dragged Norton from his bed, kicked and punched him, and handcuffed his hands behind his back. Norton struggled to escape and reach the gun he kept on his headboard, but the men subdued him and he noticed the gun was gone. The taller black man had two guns.

> The men continued to beat Norton. They dragged him, naked, into the living room and bound his knees and ankles together with

3

duct tape.

The white male and the taller black male searched the house; the shorter black male guarded Norton. The man pointed a gun at Norton's head and said he was going to kill him because he had tried to escape. After searching the house, the men used the Taser on Norton's side and back until he gave them the combination to his office safe.

The intruders put Norton up against a pillar in his living room and duct-taped him to it. The taller black man brought in a gas can, doused Norton with gasoline, and flicked a lighter on and off. The man told Norton if he could get out, he could live. The shorter black male used the Taser on Norton's side and near his crotch.

The men ultimately got into Norton's truck and drove away. They took Norton's guns, marijuana plants that he testified he had for medical purposes, a small off-road vehicle, and a trailer attached to the truck.

**Aftermath of the Crime**

The waiting Churchill received a text message on her cell phone from Lavender, telling her they were almost finished. Shortly after, Churchill saw the three men driving down the road in Norton's truck. Scarabello called Churchill on her cell phone and asked if they could stash the stolen goods on her mother's property. She refused, and instead the men decided to take the property to Sheyne Stevenson's house. Stevenson was a friend of Lavender and Scarabello.

At Stevenson's house, Scarabello backed Norton's truck and trailer up to the garage. Churchill looked inside the trailer and saw marijuana plants, growing equipment, an off-road vehicle, and guns.

Tehama County Sheriff's Deputy Cindie Sharp responded to a 911 call from Norton; she found him upset and injured. Norton had abrasions and bruising on his face, side, arms, back, and chest. His eye and lips were swollen and bruised. Norton suffered scratches on his back and chest, and a laceration and red marks on his wrists. Sharp smelled gasoline in the house, which had been ransacked. Sharp found duct tape, handcuffs, and a handcuff key in the house.

A day or so later, Scarabello, Lavender, and Foster returned to Stevenson's house. They smoked marijuana and talked about the incident. Lavender told Stevenson that the trio had staked out Norton's house all night before entering the next morning. Scarabello woke up Norton, and Lavender took the gun from Norton's nightstand. Someone bound Norton with duct tape, and Foster shot him with a Taser. The men handcuffed Norton, poured

gasoline on him, and eventually left with the truck, trailer, and marijuana. Foster admitted to Stevenson that he shot Norton with the Taser.

A day or two after hearing the full story of what had happened, Stevenson asked Scarabello to remove the stolen goods from his garage. Scarabello, Lavender, and Lavender's brother removed the items. Stevenson took a picture of Lavender, Lavender's brother, and the stolen marijuana with his cell phone camera.

A few days after the robbery, officers executed a search warrant at Stevenson's house. Although initially Stevenson denied knowing details about the robbery, he later admitted he had lied. Stevenson provided the names of everyone involved and gave an account of the robbery.

After his arrest, Foster voluntarily spoke with detectives. He gave a detailed confession of the robbery and beating of Norton.

**Defense Case**

### Lavender

Patricia Pilkington, who lived with defendant Lavender, testified she was with him the night of the robbery. She would have known if he had left during the night. Lavender was there the next morning and stayed with her children while she went to a doctor's appointment from 8:45 a.m. to 10:30 a.m.

Sabrina Wilson testified she saw Lavender at his apartment the night of the robbery. He was still there when she left around 12:30 a.m. Lavender was there the next morning when Wilson picked up Pilkington for her doctor's appointment and was there when they returned around 10:30 a.m.

Lavender's brother testified that the day of the robbery, he and Lavender went to Stevenson's house to see some marijuana they had heard about. Two black men were there with Scarabello and Stevenson. Lavender's brother took a picture of the marijuana with his cell phone camera.

Two women testified they went to a concert with Lavender the day after the robbery. They were with him until about 2:00 o'clock the next morning.

### Foster

Gabriel Paoli testified he played basketball with defendant Foster on the evening before the robbery. They began playing around 5:30 p.m. and played for three-and-a-half hours. After the game, they went to a friend's house for a couple of hours.

> A detective was recalled as a defense witness. The detective testified that after his confession, Foster provided the clothing he wore the night of the robbery:  a pair of Adidas sneakers, jeans, and a T-shirt.
>
> The jury found [Lavender and Foster] guilty of counts II through IX and found all special allegations true. The jury was unable to reach a verdict on attempted murder, and the court declared a mistrial as to that count.
>
> The trial court sentenced [Lavender and Foster] to the upper term of nine years on count II; a consecutive one-year sentence on count III; a sentence of three years on count IV, stayed pursuant to section 654; a consecutive sentence of two years on count V, stayed pursuant to section 654; a consecutive upper term sentence of six years on count VI, stayed pursuant to section 654; a consecutive sentence of two years on count VII, stayed pursuant to section 654; a consecutive sentence of eight months on count VIII; and a consecutive sentence of two years on count IX, stayed pursuant to section 654. In addition, the court sentenced [Lavender and Foster] to a consecutive sentence of 10 years pursuant to section 12022.53.  Enhancements for counts V, VI, VII, and IX were stayed and the enhancement for count VIII was stricken. Ultimately, the court sentenced both [Lavender and Foster] to a total of 20 years 8 months.

People v. Lavender, 2008 WL 3029694 at *1-3 (Cal. App. 3 Dist. 2008).

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1    28 U.S.C. § 2254(d).

2           Under section 2254(d)(1), a state court decision is "contrary to" clearly

3    established United States Supreme Court precedents if it applies a rule that contradicts the

4    governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

5    indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

6    result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

7    (2000)).

8           Under the  "unreasonable application" clause of section 2254(d)(1), a federal

9    habeas court may grant the writ if the state court identifies the correct governing legal principle

10   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

11   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

12   simply because that court concludes in its independent judgment that the relevant state-court

13   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

14   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

15   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

16   question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

17   omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

18   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

19   Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

20          The court looks to the last reasoned state court decision as the basis for the state

21   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

22   decision, "and the state court has denied relief, it may be presumed that the state court

23   adjudicated the claim on the merits in the absence of any indication or state-law procedural

24   principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be

25   overcome by a showing that "there is reason to think some other explanation for the state court's

26   decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

1    Where the state court reaches a decision on the merits but provides no reasoning

2 to support its conclusion, the federal court conducts an independent review of the record.

3 "Independent review of the record is not de novo review of the constitutional issue, but rather,

4 the only method by which we can determine whether a silent state court decision is objectively

5 unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

6 decision is available, the habeas petitioner has the burden of "showing there was no reasonable

7 basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

8 determine what arguments or theories supported or, . . . could have supported, the state court's

9 decision; and then it must ask whether it is possible fairminded jurists could disagree that those

10 arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

11 786.

12 V.  Petitioner's Claims

13        A.  Petitioner's Confession

14    Petitioner claims the confession was the product of coercion because his statement

15 was not voluntary, but given as a direct result of the detective's threat that unless petitioner

16 talked, petitioner would have to serve three consecutive life sentences in prison.  (Dkt. No. 1 at

17 9.)  Petitioner also claims that the detective's threat that petitioner may never see his mother

18 again unless she comes to visit, suggested that if petitioner confessed, petitioner would not have

19 to see his mother in prison, meaning petitioner would not go to prison.  (Dkt. No. 1 at 11.)

20 Finally, petitioner argues his will was overborne because he was sleep-deprived and drowsy from

21 Oxycontin, a prescription pain-killer petitioner took shortly before the detectives arrived.

22 (Reporter's Transcript ("RT") at 65.)

23    Respondent argues that the statements made to petitioner were based on the truth,

24 and it is not coercion for a law enforcement officer to accurately recite consequences.  (Dkt. No.

25 15 at 17.)  Respondent further contends it is not coercion to encourage a suspect to tell the truth.

26 Because the detectives encouraged petitioner to tell the truth and told petitioner the consequences

8

1    that petitioner would face if petitioner did not tell the truth, defendants aver the detectives'

2    statements were not coercive.  Finally, respondent argues that the totality of the circumstances

3    demonstrate that petitioner's will was not overborne.  (Id.)

4           The last reasoned rejection of this claim is the decision of the California Court of

5    Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

6    this claim as follows:

7           **Admissibility of Foster's Confession**

8           Foster argues the trial court erred in admitting his confession,
     violating his right to due process. According to Foster, his
9    confession was involuntary, the product of coercion by detectives.

10          **Background**

11           Prior to trial, Foster's defense counsel filed a motion in limine to
     exclude evidence of statements Foster made when arrested.

12

13           At the hearing on the motion, Detective Richard Davidson
     testified that after he and three officers arrested Foster, Davidson
     read Foster his Miranda rights.[FN2]  Foster waived those rights
14   and voluntarily agreed to speak with the detective.

15          [FN2.] Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694].

16           Officers arrested Foster in an apartment.  When [Foster]
     answered the door, officers, with guns drawn, arrested Foster, took
17   him to the "ground," and handcuffed him with his hands behind his
     back.  Foster remained handcuffed throughout the interview.

18
             Davidson and Detective Dave Greer interviewed Foster about the
19   robbery for 30 to 45 minutes.  Davidson termed Foster's demeanor
     "good."  Foster initially denied involvement in the robbery;
20   subsequently he began to discuss the robbery.

21           At the hearing, Foster testified he was 20 years old at the time of
     his arrest.  He had been arrested twice before.  Foster stated he
22   confessed to officers only because he was "threatened with three
     consecutive life sentence [s]."
23
             During the interview Foster began to fall asleep because he had
24   taken a prescription painkiller an hour or two before.  The
     medication rendered him unable to understand the detectives'
25   questions. Foster felt paranoid, frightened, and tired.

26   ////

9

1      On cross-examination, Foster stated he was tired because of his heavy work schedule the day before his arrest.

2

3      The trial court, after reviewing the audio tape and transcript of the interview, denied Foster's motion. The  court found the detectives did not induce Foster's statements by artifice, deception, trickery, or fraud.

4

5      During the interview, Davidson and Greer both questioned Foster.  Greer asked:  "How does attempted murder sound? [¶] Robbery. [¶] Robbery, kidnap."  Davidson stated:  "Oh, uh [Lavender's] . . . booked on nine different charges I think right now."  Greer continued:  "Three consecutive life sentences is what you're looking at." Davidson stated: "Yeah, this is life dude. This is goodbye, don't come back."  Greer echoed:  "You don't get to come back."

6

7

8

9      The detectives told Foster they wanted to hear his side of the story, and that he might have become involved with the wrong people. Greer told Foster: "Jamar may have some room to help himself."

10

11

12      Foster asked the detectives to tell his mother he had been arrested. The detectives refused, and Foster said, ". . . just tell her I'm, I'm. . . ."  Greer interjected with:  "That you may never see her again unless she comes to visit. [¶] . . .  [¶]  Don't waste this opportunity. You might never get it again."

13

14

15      Davidson told Foster he needed to "come clean.... Cause that's about the only thing that's going to help you at this point is how ... much you want to come clean. It's up to you. I get paid either way. You know ... what we're talking about man." After detectives told Foster he would make it to a court appointment on another case, Foster told detectives about the robbery.

16

17

18

**Discussion**

19

20    A confession is involuntary and subject to exclusion at trial only if it is the product of coercive police activity. The use of an involuntary confession constitutes a denial of due process under both the federal and state Constitutions.  (People v. Williams (1997) 16 Cal.4th 635, 659, 66 Cal.Rptr.2d 573, 941 P.2d 752 (Williams); People v. Holloway (2004) 33 Cal.4th 96, 114, 14 Cal.Rptr.3d 212, 91 P.3d 164 (Holloway).)

21

22

23    The prosecution must prove by a preponderance of the evidence that a defendant's confession was voluntary.  On appeal, we defer to the trial court's findings of fact surrounding the confession if they are supported by substantial evidence, but we review de novo

24

25

26  ////

10

the ultimate question of whether the confession was voluntary. (Holloway, supra, 33 Cal.4th at p. 114, 14 Cal.Rptr.3d 212, 91 P.3d 164.)

A confession is voluntary if the suspect's decision to speak is entirely self-motivated because the defendant freely and voluntarily chooses to speak without any form of compulsion or promise of reward. No single factor is dispositive in determining the question of voluntariness. Courts have prohibited psychological tactics by police that, under all the circumstances, are so coercive they tend to produce a statement that is both involuntary and unreliable. (People v. Thompson (1980) 27 Cal.3d 303, 327-328, 165 Cal.Rptr. 289, 611 P.2d 883; Williams, supra, 16 Cal.4th at p. 660, 66 Cal.Rptr.2d 573, 941 P.2d 752; People v. Jones (1998) 17 Cal.4th 279, 297-298, 70 Cal.Rptr.2d 793, 949 P.2d 890.)

We determine the voluntariness of a confession by applying a totality of circumstances test. We include factors such as the element of police coercion, the length of interrogation, its continuity, and the defendant's maturity, education, physical condition, and mental health.  (People v. Haley (2004) 34 Cal.4th 283, 298, 17 Cal.Rptr.3d 877, 96 P.3d 170.)

If police lead a defendant to believe he might reasonably expect benefits such as more lenient treatment by the police, the prosecution, or the court in exchange for his statement, even if truthful, this motivation renders the statement involuntary. However, mere advice or exhortation that it would be beneficial to be truthful, when unaccompanied by either threat or promise, does not render a confession involuntary when the benefit pointed out flows naturally from a truthful statement. (Holloway, supra, 33 Cal.4th at p. 115, 14 Cal.Rptr.3d 212, 91 P.3d 164.)

Here, Foster argues officers coerced his statement through threats and offers of lenient treatment.  According to [Foster], officers threatened him with three consecutive life terms and the prospect of never seeing his mother again unless she came to visit, presumably in prison.  In addition, he had been deprived of sleep and was drowsy from medication.  Finally, a previous encounter with police left him physically injured.

The record reveals detectives told Foster he faced three consecutive life sentences unless he helped himself by "com[ing] clean."  They offered him one more opportunity to tell the truth, or else he faced charges of robbery, attempted murder, and kidnapping.

In evaluating a claim of coercion we consider whether the influences brought to bear upon the defendant were such as to overbear the defendant's will to resist, constituting a motivating cause of the defendant's subsequent confession.  (People v. Kelly

11

(1990) 51 Cal.3d 931, 952, 275 Cal.Rptr. 160, 800 P.2d 516.)
However, an officer does not invalidate a subsequent confession by
merely commenting on the realities of the situation.  Truthful or
commonplace statements of possible legal consequences,
unaccompanied by threats or promises, are permissible police
practices and do not, by themselves, render a statement involuntary
and inadmissible.  (People v. Seaton (1983) 146 Cal.App.3d 67,
74, 194 Cal.Rptr. 33; People v. Flores (1983) 144 Cal.App.3d 459,
469, 192 Cal.Rptr. 772.)

Here, detectives told Foster he faced a variety of criminal
charges.  They also told him of the possible sentence such charges
might bring.  Such comments reflected the reality of Foster's
situation and were not coercive threats rendering his subsequent
statements inadmissible.

In response to Foster's request that they contact his mother, the
detectives informed him he would only see his mother in prison
unless he confessed. Foster argues this "was a clear suggestion that
if he confessed, he would not have to see his mother in prison,
meaning that he would not go to prison."

We disagree.  The detective's statement was not a statement
promising leniency by either the police, the prosecution, or the
court.  Instead, the detectives informed Foster that he faced prison
for a very long time unless he told the truth.

Nor were the officers' exhortations to unburden himself or "come
clean" coercive.  Police comments that a defendant would feel
better or would help himself by cooperating do not, by themselves,
constitute improper inducements.  (People v. Jackson (1980) 28
Cal.3d 264, 299-300, 168 Cal.Rptr. 603, 618 P.2d 149.)

Finally, Foster points to his fatigue and the effect of medication
on his ability to withstand the officers' questioning.  However, the
interrogation lasted around 45 minutes, during which Foster never
expressed any difficulty in understanding or responding to the
detectives' questions.  Near the end of the interview Foster stated
he was "dozing off."  By this point, Foster had already provided a
detailed description of the events surrounding the robbery of
Norton.

At the time of questioning, Foster was a 20-year-old high school
graduate who had completed a year and a half of junior college and
had previously been arrested twice.  Under the totality of the
circumstances, the trial court did not err in finding that Foster's
statements to the detectives were voluntary and not the product of
coercion or promises of leniency.

People v. Lavender, 2008 WL 3029694 at *4-6.

1    The Fourteenth Amendment to the United States Constitution demands that

2   confessions be made voluntarily.  See Lego v. Twomey, 404 U.S. 477, 483-85 (1972) "use of

3   coerced confessions . . . is forbidden because the method used to extract them offends

4   constitutional principles.")  A confession is voluntary only if it is "'the product of a rational

5   intellect and a free will.'"  Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting

6   Townsend v. Sain, 372 U.S. 293, 307 (1963)).  "The line of distinction is that at which governing

7   self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to

8   propel the confession."  Collazo v. Estelle, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting

9   Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).

10    The voluntariness of a confession is determined in light of the totality of the

11   circumstances.  Withrow v. Williams, 507 U.S. 680, 693 (1993).  This includes consideration of

12   both the characteristics of the petitioner and the details of the interrogation.  Schneckloth v.

13   Bustamonte, 412 U.S. 218, 224 (1973)), cert. denied, 124 S. Ct. 446 (2003).  The Ninth Circuit

14   recently stated that these factors include "the degree of police coercion; the length, location and

15   continuity of the interrogation; and the defendant's maturity, education, physical condition,

16   mental health, and age."  Brown v. Horell, 2011 WL 2685580 (9th Cir. July 12, 2011) (citation

17   omitted).  In the end the court must determine under the totality of the circumstances whether the

18   government obtained the statement by physical or psychological coercion or by improper

19   inducement so that the suspect's will was overborne.  Beatty v. Stewart, 303 F.3d 975, 992 (9th

20   Cir. 2002) (internal quotation and citation omitted).

21    After a review of the instant record, this court concludes that the decision of the

22   California Court of Appeal that petitioner's statement to the detective was neither coerced nor

23   involuntary is not contrary to or an unreasonable application of federal law and should not be set

24   aside.  The facts cited by the Court of Appeal are consistent with this court's review of the

25   transcribed interview.  (See Clerk's Supplemental Transcript on Appeal (LD 7) at 23-84.)  The

26   record confirms that the detective did not make any threats or promises of leniency.  (Id.)

Moreover, the totality of the circumstances surrounding petitioner's statement do not demonstrate petitioner's will was overborne.  As noted by the Court of Appeal, the interrogation lasted around 45 minutes, during which petitioner did not claim he could not understand the questions or could not respond to the questions due to fatigue or the pain medication petitioner had taken.  It was not until late in the interview that petitioner stated he was "dozing off," (LD 7 at 71), and by then, as the Court of Appeal noted, petitioner had divulged the detailed facts concerning the home invasion robbery.  During cross-examination at the motion to suppress hearing, petitioner confirmed that his fatigue stemmed from his work schedule the prior day. (RT at 67.)  Petitioner testified that he was a twenty-year-old high school graduate who had completed a year and a half of classes at Shasta College.  (RT at 66.)  Petitioner admitted he previously been arrested twice.  (RT at 68.)  These findings by the state courts have not been rebutted by clear and convincing evidence.

Although petitioner argues that the questioning was coercive, there is no evidence before this court that coercion led to petitioner's statements or that petitioner's will was overborne.  See Clark v. Murphy, 331 F.3d 1062, 1073 (9th Cir. 2003) (eight hour interrogation in a small, windowless interrogation room did not render confession involuntary), cert. denied, 540 U.S. 968 (2003), overruled in part on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003); United States v. Coleman, 208 F.3d 786, 791 (9th Cir. 2000) (defendant's heroin withdrawal causing lethargy and discomfort did not render his statements to police involuntary). Accordingly, the state court's rejection of petitioner's first claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.  Petitioner's first claim for relief should be denied.

////

////

////

////

B. <u>Petitioner's Claim Under Cunningham</u>

Petitioner argues that the trial court erred by imposing an upper term for counts II and VI, and the enhancement on count VI, in violation of the Sixth Amendment.[4]

Respondent contends the facts of the crime demonstrate that there is no basis for reasonable doubt that a jury would have found the relevant aggravating factors substantiating the upper term sentence.

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  Petitioner's co-defendant initiated this claim on direct appeal, and, as noted below, petitioner incorporated Lavender's argument in petitioner's appeal.  The state court addressed this claim as follows:

### LAVENDER'S APPEAL

**Sentencing Error**

Lavender appeals, arguing the trial court erred in imposing the upper term for counts II and VI, and the enhancement on count VI, based on facts that were neither found by the jury nor admitted by Lavender.  Foster incorporates this argument in his appeal.

**Background**

The court sentenced [Lavender and Foster] to the upper term of nine years on count II, robbery, and a consecutive upper-term sentence of six years on count VI, burglary, which was stayed pursuant to section 654.

In imposing the upper term, the court found the crimes involved great violence, great bodily harm, threat of bodily harm, and other acts disclosing a high degree of cruelty, viciousness, or callousness.  The court also found each defendant was armed or used a weapon, the victim was particularly vulnerable, the manner in which the crimes were committed indicated planning and sophistication, and [Lavender and Foster] engaged in violent conduct indicating a serious danger to society.

---

[4]   Although petitioner included a challenge to the alleged imposition of an enhancement on count II, the record does not reflect such an enhancement was imposed.  (RT at 934.)  Moreover, the sentencing claim raised in the petition for review in the California Supreme Court only challenged the enhancement to count VI.  (LD 4.)

As to count II, the court imposed the upper term, stating: "I have already stated all of the general terms specifically. I have relied on . . . great violence, cruelty and viciousness; and . . . planning and sophistication. . . ." As to count VI, the court stated: "In any event, I cite all of the aggravating factors, specifically 421(a)(1), as we have just reviewed it on the record. The maximum-the term is six years as to the enhancement. I select the ten-year term, relying on 421(a)(3), the victim being particularly vulnerable, along with the other generalities stated."

**Discussion**

Under <u>Cunningham v. California</u> (2007) 549 U.S. 270 [127 S.Ct. 856, 166 L.Ed.2d 856] (<u>Cunningham</u>), the United States Supreme Court held that California's procedure for selecting the upper term violated the defendant's Sixth and Fourteenth Amendment rights to jury trial because it gave to the trial judge, not the jury, authority to find the facts that expose a defendant to an elevated upper term sentence. The Constitution prohibits "a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (166 L.Ed.2d at p. 864.)

On appeal, we find <u>Cunningham</u> error harmless if we conclude, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, would unquestionably have found true at least a single aggravating factor had it been submitted to a jury. (<u>People v. Sandoval</u> (2007) 41 Cal.4th 825, 839, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) Although Lavender sharply criticizes <u>Sandoval's</u> error analysis, we are bound by the decisions of the Supreme Court. (<u>People v. Zichwic</u> (2001) 94 Cal.App.4th 944, 952, 114 Cal.Rptr.2d 733.)

Here, the court referenced several factors in aggravation, none found true by the jury. However, as to both the robbery and burglary counts there was undisputed evidence the crimes involved great violence, great bodily injury, and other acts disclosing a high degree of cruelty and callousness.

[Lavender and Foster] woke Norton at gunpoint, handcuffed him, beat him, bound his knees and ankles with duct tape, and taped him to a pillar. They used a Taser to force Norton to reveal the combination to his safe. [Lavender and Foster] poured gasoline over Norton, flicked a lighter on and off, and threatened to burn down his house. Norton suffered numerous abrasions, bruising, and lacerations at the hands of [Lavender and Foster].

The evidence at trial also revealed the crimes were carried out with planning and sophistication. After learning that Norton was growing large amounts of marijuana, Scarabello located his address on the Internet and obtained aerial photos of the property. The trio

1   armed themselves, brought a Taser and duct tape, and obtained
2   masks to obscure their features.  Churchill and the trio staked out
    Norton's house prior to robbing it.  After entering, the three
3   systematically subdued and beat Norton, located his marijuana,
    loaded the stolen goods into Norton's truck and trailer, and stored
4   them at Stevenson's house.

5       Lavender argues it cannot be shown beyond a reasonable doubt
    that the jury would have found Norton particularly vulnerable.
6   Lavender points to Norton's occupation as a hunting guide who had
    prior convictions for possession of brass knuckles and marijuana.
    Norton also had a loaded gun on his nightstand.
7
8       We disagree.  The evidence revealed the trio woke Norton at
    gunpoint, beat him, bound him with duct tape, shot him with a
9   Taser, and threatened him with gasoline and a lighter.  Norton was
    alone during his ordeal; his roommates were gone.  During the
10  robbery, [Lavender and Foster] pointed a gun at Norton's head and
    told him he was going to be killed.

11      Given the evidence at trial, the jury would have found the
    aggravating circumstances true beyond a reasonable doubt had they
12  been presented.  Therefore, any error under Cunningham was
    harmless.
13

14  People v. Lavender, 2008 WL 3029694 at *6-8.

15          A criminal defendant is entitled to a trial by jury and to have every element

16  necessary to sustain his conviction proven by the state beyond a reasonable doubt.  U. S. Const.

17  amends. V, VI, XIV.  In Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the United States

18  Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires any fact

19  other than a prior conviction that "increases the penalty for a crime beyond the prescribed

20  statutory maximum" to be "submitted to a jury and proved beyond a reasonable doubt."  In

21  Blakely v. Washington, 542 U.S. 296, 303-04 (2004), the United States Supreme Court decided

22  that a defendant in a criminal case is entitled to have a jury determine beyond a reasonable doubt

23  any fact that increases the statutory maximum sentence, unless the fact was admitted by the

24  defendant or was based on a prior conviction.  Id., at 303-04.  The Supreme Court also clarified

25  the definition of "statutory maximum" for purposes of the constitutional rule:  "the relevant

26  'statutory maximum' is not the maximum sentence a judge may impose after finding additional

17

1  facts, but the maximum he may impose *without* any additional findings." Id.  In United States v.

2  Booker, 543 U.S. 220 (2005), the United States Supreme Court applied Blakely to the Federal

3  Sentencing Guidelines.  The court clarified that "'the statutory maximum' for Apprendi purposes

4  is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury

5  verdict or admitted by the defendant."  Id. at 232.

6          In 2005, the California Supreme Court issued its decision in People v. Black

7  ("Black I" ), 35 Cal. 4th 1238, 29 Cal. Rptr. 3d 740 (2005), cert. granted and judgment vacated,

8  549 U.S. 1190 (2007), on remand, 41 Cal. 4th 799, 62 Cal. Rptr. 3d 569 (2007).  In Black I, the

9  court held that California's statutory scheme providing for the imposition of an upper term

10 sentence did not violate the constitutional principles set forth in Apprendi and Blakely.  Black I,

11 35 Cal.4th at 1257-58.  The Black I court reasoned that the discretion afforded to a sentencing

12 judge in choosing a lower, middle, or upper term rendered the upper term under California law

13 the "statutory maximum."  Id. at 1257-61.

14         In 2007, the United States Supreme Court issued its decision in Cunningham v.

15 California, 549 U.S. 270 (2007).  Cunningham held that a California judge's imposition of an

16 upper term sentence based on facts found by the judge, other than the fact of a prior conviction,

17 violated the constitutional principles set forth in Apprendi and Blakely.  Cunningham, 549 U.S.

18 at 288-89.  Cunningham expressly disapproved the holding and the reasoning of Black I, finding

19 that the middle term in California's determinate sentencing law was the relevant statutory

20 maximum for purposes of applying Blakely and Apprendi.  Cunningham, 549 U.S. at 291-93.  In

21 light of Cunningham, the Supreme Court vacated Black I and remanded the case to the California

22 Supreme Court for further consideration.  Black v. California, 549 U.S. 1190 (2007).  On

23 remand, the California Supreme Court determined that so long as one of the aggravating factors

24 upon which an upper term sentence is predicated has been established in a manner consistent

25 with the Constitution, the upper term sentence is the "statutory maximum," and thus may

26 constitutionally be imposed.  People v. Black ( "Black II" ), 41 Cal. 4th 799, 813-15, 62 Cal.

1   Rptr. 3d 569 (2007).  The Ninth Circuit subsequently held that <u>Cunningham</u> may be applied

2   retroactively on collateral review."  <u>Butler v. Curry</u>, 528 F.3d 624, 639 (9th Cir. 2008), <u>cert.</u>

3   <u>denied</u>, 129 S. Ct. 767 (2008).

4           The Ninth Circuit has also affirmed that a single aggravating factor is sufficient to

5   authorize an upper term sentence under California law.  <u>See Butler</u>, 528 F.3d at 641-42 (citing

6   <u>Black II</u>, 41 Cal.4th at 812).  Therefore, if at least one of the aggravating factors on which a judge

7   relies in sentencing a defendant to an upper term sentence is established in a manner consistent

8   with the Sixth Amendment, the sentence does not violate the Constitution.  <u>Butler</u>, 528 F.3d at

9   643.

10          However, even if none of the aggravating factors on which a judge relies in

11  sentencing a defendant to an upper term sentence is established in a manner consistent with the

12  Sixth Amendment, reversal is not required if the error was harmless.  <u>Washington v. Recuenco</u>,

13  548 U.S. 212, 221-22 (2006) (sentencing errors subject to harmless error analysis); <u>see also</u>

14  <u>Butler</u>, 528 F.3d at 648 (harmless error standard under <u>Brecht v. Abrahamson</u>, 507 U.S. 619

15  (1993), will prevent relief unless the error had a "substantial and injurious effect" on a

16  defendant's sentence). To grant habeas relief in a case involving a constitutional error in the

17  imposition of an upper term sentence, the court must have "grave doubt" as to whether a jury

18  would have found the relevant aggravating factor beyond a reasonable doubt.  <u>Butler</u>, 528 F.3d at

19  648.  "Grave doubt" is unusual; it exists "when, in the judge's mind, the matter is so evenly

20  balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  <u>O'Neal v.</u>

21  <u>McAninch</u>, 513 U.S. 432, 435 (1995); <u>Butler</u>, 528 F.3d at 648.

22          In the instant action, petitioner has failed to demonstrate that he is entitled to

23  habeas relief based upon the trial court's imposition of an upper term sentence on Counts II and

24  VI and an enhancement to Count VI.  At sentencing the trial court concluded:

25          The facts of this case would send shivers down the spine of any
            honest citizen.  I know many people, as do you, who have suffered
26          burglaries, who felt violated, maybe couldn't get it back together

1 for a long time, some of them forever, and they weren't even there
when the burglary happened.  Similarly with robberies, they are
2 bad in any form.  But usually someone sticks a gun in someone
else's face and says, "Empty your pockets" or "give me the cash
3 drawer," which occurs, and the robber leaves.  The facts in this
case far exceed that type of robbery, and yet even those robberies
4 mar people.  I can only imagine how permanently affected this
victim might be.  Any person or persons who would do the things
5 to this victim that these Defendants did deserve the maximum
penalty.

6

7 (RT at 930.)  The trial court found the following aggravating factors supported the base terms

8 imposed:

9 the crimes involved great violence, great bodily harm, threat of
bodily harm and other acts disclosing a high degree of cruelty,
10 viciousness or callousness;. . .  each defendant was armed with or
used a weapon at the time of the commission of the crime; . . . the
11 victim was particularly vulnerable; the manner in which the crimes
were carried out indicates planning, sophistication and
12 professionalism; and . . . each defendant engaged in violent
conduct which indicates a serious danger to society.

13

14 (RT at 933.)  In connection with Count II, home invasion robbery, the trial court sentenced

15 petitioner to the upper term, relying on "great violence, cruelty and viciousness; and . . . planning

16 and sophistication."  (RT at 934.)  The trial court sentenced petitioner to the upper term on count

17 VI, first degree residential burglary, based on the aggravating factors previously stated.  (RT at

18 935.)  The upper term was imposed for the enhancement to count VI based on "the victim being

19 particularly vulnerable," along with the previously stated aggravating factors.  (RT at 936.)

20 The record contains overwhelming and uncontroverted evidence supporting the

21 aggravating factors[5] set forth by the trial court, as well as the sentence imposed.  Many of the key

22 facts upon which the sentencing court relied were contained in petitioner's confession.  (LD 7:

23

24 [5]  Pursuant to California Rule of Court 4.421, aggravating factors that may be considered
include:  (1) "The crime involved great violence, great bodily harm, threat of great bodily harm,
25 or other acts disclosing a high degree of cruelty, viciousness, or callousness" and (2) "[t]he
manner in which the crime was carried out indicates planning, sophistication, or
26 professionalism."  Id.

1  existence of plan (at 29): victim awakened from sleep (at 35, 38); victim was handcuffed (at 35);

2  perpetrators had gun, two knives and a taser (at 36, 40, 49); gas was poured near the victim (at

3  39, 52); the victim was duct-taped (at 40); petitioner walked up and threatened to taser the victim

4  (at 49); perpetrators took the victim's marijuana and lights (at 50); perpetrators loaded stolen

5  items into victim's trailer (at 65); and the perpetrators drove the victim's Quad and trailer to a

6  thirty party's house (at 68).)  As noted by the Court of Appeal, the trial court cited the fact that

7  the criminal acts demonstrated the cruel and callous nature of the crimes, and that petitioner and

8  his co-defendant used planning and sophistication in carrying out the crimes.  As described by

9  the Court of Appeal, the record supports these findings.  Under these circumstances, any

10  Cunningham error by the sentencing court in sentencing petitioner to the upper term would not

11  have had a substantial and injurious effect or influence on the jury verdict.  Brecht, 507 U.S. 619.

12  Put another way, the result would have been the same had this issue been submitted to the jury.

13  Butler, 528 F.3d at 648.  A finding of planning and sophistication, as well as a finding that the

14  crime involved at least the threat of great bodily harm, is evident from the jury's finding that

15  petitioner was guilty of Counts II and VI.  The very facts cited by the trial court, which are

16  evident in the trial record, also support these aggravating factors.  This court does not have a

17  "grave doubt" as to whether a jury would have found any of these aggravating factors true

18  beyond a reasonable doubt.  Accordingly, any error in failing to submit the aggravating factors to

19  the jury for consideration was harmless.

20  Therefore, the state court's rejection of petitioner's second claim for relief was

21  neither contrary to, nor an unreasonable application of, controlling principles of United States

22  Supreme Court precedent.  Thus, petitioner's second claim for relief should be denied.

23  VII.  Conclusion

24  For all of the above reasons, the undersigned denies petitioner's application for a

25  writ of habeas corpus.

26  ////

Before petitioner can appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).

For the reasons set forth above, the undersigned finds that petitioner has not made a showing of a substantial showing of the denial of a constitutional right.

Accordingly, IT IS HEREBY ORDERED that:

1.  Petitioner's application for a petition for writ of habeas corpus is denied; and

2.  The court declines to issue the certificate of appealability referenced in 28 U.S.C. § 2253.

DATED:  July 21, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

fost3238.157